**SECOND DIVISION**
**ANDREWS, P. J.,**
**MCFADDEN and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 18, 2015**

# In the Court of Appeals of Georgia

A14A2033. WILLIAMS v. PAULEY et al.

ANDREWS, Presiding Judge.

Carl Pauley was killed when the vehicle he was driving collided with a horse that strayed onto Highway 27 in Floyd County. Pauley's surviving spouse, Christine Pauley, acting individually and as administratrix of her husband's estate, brought wrongful death and survival claims against David Williams, a police officer employed by the Floyd County Police Department. Ms. Pauley's suit was brought against Officer Williams in his individual capacity, and sought to impose personal liability on Williams on the basis that, while acting as a police officer responding to the stray horse on the highway, he negligently failed to remove the horse from the highway, and that this negligence caused the fatal accident. Asserting "official immunity" from these claims, Officer Williams moved for summary judgment, the trial court denied

the motion, and Officer Williams appeals. For the following reasons, we find the suit was barred by "official immunity," and reverse.

> The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.

*Cameron v. Lang*, 274 Ga. 122, 123 (549 SE2d 341) (2001) (citations and punctuation omitted); *Gilbert v. Richardson*, 264 Ga. 744, 750-753 (452 SE2d 476) (1994). Official immunity, which usually is a question of law, is an entitlement not to stand trial rather than a mere defense to liability. Id. at 124. Thus, as a county law enforcement officer, Williams is entitled to official immunity for the negligent performance of discretionary acts within the scope of his authority as an officer; he may be personally liable if he negligently performed a ministerial act or acted with actual malice or an intent to injure when performing a discretionary act. *Cameron*, 274 Ga. at 125-126; *Phillips v. Hanse*, 281 Ga. 133, 133 (637 SE2d 11) (2006). Because Ms. Pauley does not claim that Officer Williams acted with actual malice or

2

an intent to injure, the issue is whether the alleged negligence involved discretionary or ministerial action.

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty.

*Banks v. Happoldt*, 271 Ga. App. 146, 149 (608 SE2d 741) (2004) (citations and punctuation omitted).

The record shows that, on the morning of the fatal accident, Officer Williams responded to a Floyd County 911 call that a horse was loose on Highway 27. The officer's police cruiser was equipped with a video camera that was activated and recorded events and time. After arriving on the scene, the officer located the horse in the median of the highway at about 4:38 a.m. The officer left the scene briefly, returned at about 4:57 a.m., spotted the horse in the roadway, and followed the horse in his cruiser with blue lights activated for a few minutes until about 5:00 a.m. The officer testified that every time he got near the horse in his cruiser the horse "took off." At about 5:03 a.m., the officer exited his cruiser, approached the horse on foot,

3

and was able to get hold of the horse by its halter. The horse was wearing a halter without a lead rope. At about 5:05 a.m., the officer walked back to the cruiser leading the horse by the halter. At that point, with the horse in the median of the highway, the officer called police dispatch, and reported to his supervisor that he was having difficulty controlling the horse, was concerned about leaving the horse because it might run into the road, and asked for advice. The officer's supervisor told him that, if he left the horse, he should first lead the horse as far off the roadway as he could. The officer testified that he did what the supervisor said and led the horse off the roadway. But at about 5:13 a.m., the cruiser's video camera showed the officer walking back to the cruiser with the horse following behind him.

The officer explained in deposition testimony what was happening with the horse at that point:

> Q: And then at 5:13 you're coming back into the camera's view, the horse is following you but you don't have him by the halter anymore?
>
> A: No, sir.
>
> Q: He's just following you?
>
> A: Yes, sir.
>
> Q: And then at 5:14 you make the comment I'll be right back. I mean, I guess you're talking to the horse, you're trying to keep him . . .

4

A: Yes, sir.

Q: . . . under control. And then you entered your vehicle, the blue lights went off and you leave the scene at 5:14?

A. Yes, sir.

Q: And the horse was in the median at that point?

A: Yes, sir.

Q: And he wasn't attached to anything?

A: No, sir.

After leaving the horse at the scene, the officer arrived at about 5:15 a.m. in his cruiser at a nearby gas station where he went "[t]o try to get some help or a rope or something." But the gas station was closed. A few minutes later at about 5:24 a.m. police dispatch reported the fatal collision between Mr. Pauley's vehicle and the horse. Officer Williams answered additional questions at his deposition about his decision to leave the horse at the scene, and what he did after first seeking help at the gas station.

Q: [W]ould you agree with me that if you would have continued to maintain control of the horse that the accident wouldn't have happened?

A: No.

Q: And why is that?

5

A: Because I didn't have control of the horse.

Q: You had him by the halter?

A: A 1500 pound horse. I'm a 250 pound guy.

Q: But you'd already found that you were able to lead the horse by the halter, correct?

A: That didn't guarantee he was going to stay that way.

Q: But you also left him at some point and he actually followed you, so he wasn't shy of you at some point. Would you agree?

A: I don't know.

Q: Did you do any kind of gesture or anything to make him follow you or did he just follow you back because he'd developed a comfort level with you or what?

A: When he came back onto the road I said (witness makes noise) come on, because I didn't want to leave him in the road. I wanted to get him back in the median. . . .

Q: [O]nce you left the horse – I guess I'm trying to understand. What did you do to continue in pursuit of the call involving the horse?

A: I had gone down to a house located near the bridge, near the . . . farm gate, to try to locate an owner or someone who could take control of the horse.

Q: And that was during the eight minutes between [leaving the horse and the accident report]?

A: Yes, sir.

The record shows that there were no protocols or instructions of any kind that the police department used to guide officers in how to deal with straying horses or other livestock that posed a hazard.

The trial court denied Officer Williams's motion for summary judgment ruling that "[a] genuine issue of material fact exists . . . on whether or not Officer Williams attempted to take action or simply took no action at all," therefore a "factual dispute regarding Officer Williams'[s] actions the morning of the incident should first be resolved by a jury before the Court can determine if official immunity applies." We find no factual dispute in the record regarding actions taken or not taken by Officer Williams. The undisputed facts show that, when the officer arrived at the scene and found the stray horse on or adjacent to the roadway, he attempted to move the horse away from the roadway; called his supervisor to report difficulty controlling the horse and asked for advice; attempted to follow the supervisor's instructions to move the horse away from the roadway; was still unable to keep the horse away from the roadway; decided he needed help to take control of the horse; and left the horse in the median of the roadway as he drove from the scene to seek help. Whether these actions were negligent, and whether they caused or contributed to the fatal collision with the horse, is not the issue before this Court. In determining whether Officer Williams was

7

entitled to official immunity from claims that his negligence caused the accident, the issue is whether the officer's actions were discretionary or ministerial.

"The determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case–by-case basis." *Davis v. Effingham County Board of Commissioners*, 328 Ga. App. 579, 584-585 (760 SE2d 9) (2014) (citation and punctuation omitted). We conclude that Officer Williams's actions in attempting to take control of and remove the stray horse from the highway were discretionary because they called for the officer to exercise personal deliberation and judgment to reach reasoned conclusions about how to accomplish a task for which there were no specific directions. This was not a ministerial task that called merely for the execution of a simple, specific duty, or which could be accomplished by simply complying with clear and definite procedures or instructions. *Roper v. Greenway*, 294 Ga. 112, 114-115 (751 SE2d 351) (2013). Moreover, the statutory mandate in OCGA § 4-3-4 (a), which provides that "[i]t shall be the duty of the sheriff, his deputies, or any other county law enforcement officer to impound livestock found to be running at large or straying," does not require a contrary conclusion. "[A] statutorily-mandated action is not necessarily the equivalent of a ministerial act that deprives the actor of official

8

immunity if done negligently." *Todd v. Brooks*, 292 Ga. App. 329, 331 (665 SE2d 11) (2008) (citation and punctuation omitted). The fact that OCGA § 4-3-4 (a) required Officer Williams to impound the straying horse, and he failed to take control of and impound the horse, did not render his actions ministerial. *Todd*, 292 Ga. App. at 331. OCGA § 4-3-4 (a) contains no specific instructions or procedures for impounding livestock, and, as set forth above, the means of taking control of the horse and impounding it clearly required Officer Williams's deliberation and judgment. It follows that the officer's actions in attempting to comply with OCGA § 4-3-4 (a) were discretionary, and he was entitled to official immunity from a claim that he negligently failed to comply with the statutory duty to impound the horse. *Todd*, 292 Ga. App. at 331; *Murphy v. Bajjani*, 282 Ga. 197, 199-200 (647 SE2d 54) (2007). The trial court erred by denying Officer Williams's motion for summary judgment.

*Judgment reversed. McFadden and Ray, JJ., concur.*